# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TONY C. OSBORNE,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00043 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## I. Background and Standard of Review

Plaintiff, Tony C. Osborne, ("Osborne"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Osborne protectively filed applications for DIB and SSI on July 12, 2018, alleging disability as of December 1, 2017, due to hepatitis C, back problems, a learning disability, depression and anxiety. (Record, ("R."), at 15, 255-56, 259-64, 284.) The claims were denied initially and on reconsideration. (R. at 172-74, 179-81, 185-89, 191-96, 198-200.) Osborne requested a hearing before an administrative law judge, ("ALJ"). (R. at 201-02.) A hearing was held on April 9, 2020, at which Osborne was represented by counsel. (R. at 43-72.)

By decision dated May 29, 2020, the ALJ denied Osborne's claims. (R. at 15-36.) The ALJ found Osborne met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 17.) The ALJ found Osborne had not engaged in substantial gainful activity since December 1, 2017, the alleged onset date. (R. at 18.) The ALJ determined Osborne had severe impairments, namely depressive disorder; intermittent explosive disorder; unspecified personality disorder; generalized anxiety disorder; likely borderline intellectual functioning; obesity; mild cervical degenerative disc disease; and lumbar strain, but he found Osborne did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-24.) The ALJ found Osborne had the residual functional

capacity to perform simple, routine, light[2] work, requiring no more than frequent reaching, handling and fingering, bilaterally; no climbing or crawling and no exposure to work hazards, such as unprotected heights or machinery; no interaction with the public; and no more than brief and superficial interaction with others in the work environment, defined as no more than five minutes per encounter. (R. at 25.) The ALJ also found Osborne would require ordinary breaks approximately every two hours; he may fall off task up to 10 percent of the workday apart from ordinarily scheduled breaks; and he may incur an average of one unscheduled absence each month. (R. at 25.) The ALJ found Osborne was unable to perform any of his past relevant work. (R. at 34.) Based on Osborne's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Osborne could perform, including the jobs of a small parts assembler, an electronic worker and an inspector/hand packager. (R. at 34-35.) Thus, the ALJ concluded Osborne was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 36.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Osborne pursued his administrative appeals, (R. at 248-50, 376-78), but the Appeals Council denied his request for review. (R. at 1-5.) Osborne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Osborne's motion for summary judgment filed June 15, 2021, and the Commissioner's motion for summary judgment filed June 24, 2021.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

*II. Facts*[3]

Osborne was born in 1983, (R. at 255, 259), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education, with special education services and training in welding. (R. at 285.) Osborne has past work experience as an arc welder and a landscape laborer. (R. at 68, 285.) At his hearing, Osborne testified, through his counsel, he was self-employed at a landscape business from 2017 to 2019, which the ALJ found did not rise to the level of substantial gainful activity. (R. at 48.) Counsel stated that Osborne's girlfriend and a teenage employee performed most of the work since March 2019 due to Osborne's back and neck pain, as well as emotional issues. (R. at 49-50.) Osborne testified he was treated with medication for bipolar disorder and depression in 2018. (R. at 52-53.) He stated he had been fired from prior jobs due to anger issues, he continued to have anger episodes and explosive-type behavior, and he experienced blackout spells, which he described as not being in his body. (R. at 49, 55.) Since an "accident" in March 2019, Osborne stated he could not sleep and had nightmares nearly nightly, and he said he had daily suicidal thoughts due to criminal charges stemming from the accident. (R. at 53-55.) He also endorsed episodes of sadness and crying spells "about every day" since the accident. (R. at 58.)

Osborne, who is right-hand dominant, testified he injured his right hand in February 2020 when cutting a branch out of a fallen tree with a chainsaw. (R. at 61, 62.) He said he was in constant pain. (R. at 64.) He said he had not worked due to

---

[3] To the extent that treatment notes predating Osborne's alleged onset of disability are contained herein, it is either for clarity of the record or because Osborne's arguments specifically pertain thereto.

back, shoulder and neck pain, which radiated into his arms and hands, causing gripping and grasping difficulty. (R. at 62, 64.) Osborne further stated his hands swelled so he could hardly bend or move them, noting his right hand was worse. (R. at 62.) He stated his back pain had worsened since 2019. (R. at 66.) He estimated he could lift/carry up to five pounds off and on all throughout a workday; he could stand and/or walk for 25 minutes without having to sit down due to back pain; he could not sit in a hard chair without his legs going numb; and when he got up, he had balance issues and difficulty trying to get his legs going, requiring about 50 minutes to be able to walk again. (R. at 62-63.) Osborne estimated he could wash dishes for 15 minutes before having to stop due to back pain, neck pain and hand numbness. (R. at 64-65.) Osborne testified he took over-the-counter pain medications, which made his pain tolerable, and he said he spent nearly six of eight hours daily reclining or lying on his side to relieve his back pain. (R. at 63-64, 66.)

Osborne testified his girlfriend did the shopping. (R. at 59.) He stated he did not like going out in public because, since the accident, he felt like everyone was "staring a hole" through him and thought he should be incarcerated. (R. at 59.) Osborne said this made him angry, but he bottled it up and walked away. (R. at 60.)

Tricia Muth, a vocational expert, was present and testified at Osborne's hearing. (R. at 67-71.) Muth classified Osborne's past work as an arc welder as heavy,[4] skilled work, and his past work as a landscape laborer as heavy, unskilled work. (R. at 68.) Muth testified that a hypothetical individual of Osborne's age, education and work history, who had the residual functional capacity to perform

---

[4] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2020).

light work, but who must avoid hazards, such as machinery and unprotected heights, who could not climb or crawl, who could frequently, but not constantly, use the hands for bilateral reaching, handling and fingering, who could perform simple, routine tasks, who could have no public interaction, and whose interaction with others should be limited to brief and superficial encounters throughout the day, typically lasting no more than five minutes each, could perform the light jobs of a small parts assembler, an electronics worker and an inspector and hand packager, each existing in significant numbers in the national economy. (R. at 68-69.) She testified that, at the unskilled, light exertional level, the tolerable level of off-task behavior generally was 10 percent. (R. at 69.) Muth next testified that the same individual, but who could use the hands and arms only occasionally for fingering, feeling, handling, lifting and carrying, could not perform any work. (R. at 70.) Likewise, she testified that a hypothetical individual with a markedly limited ability to deal with supervisors, the public and co-workers, with markedly being defined as a substantial loss in the ability, resulting in unsatisfactory work performance, also could not perform any work. (R. at 70-71.) Muth testified that anything more than one absence monthly was work preclusive. (R. at 71.) At the end of the hearing, the ALJ advised he was sending Osborne's file to a psychological expert for an opinion, given Osborne's argument that his mental health impairments equaled the criteria of a medical listing(s). (R. at 71-72.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Dr. R. S. Kadian, M.D., a state agency physician; Nicole Sampson, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Melinda M. Fields, Ph.D., a licensed psychologist; Crystal Burke, L.C.S.W., a licensed clinical social worker; Dr. Esther Ajjarapu, M.D.; Lisa Muncy, N.P.-C., Certified Nurse Practitioner; Dr. Dallas Shone, M.D.; Mountain View

Regional Medical Center, ("Mountain View"); Wellmont Medical Associates Urgent Care; Norton Community Hospital, ("Norton Community"); Arthur W. Stair, III, M.A., a licensed senior psychological examiner; and Marshall D. Tessnear, Ph.D., a clinical psychologist.

Melinda M. Fields, Ph.D., a licensed psychologist, completed a psychological evaluation of Osborne on June 18, 2015. (R. at 576-81.) She noted Osborne was adequately groomed, and his posture and gait appeared normal. (R. at 576.) Osborne reported applying for disability benefits due to special education placement and "anger issues." (R. at 576.) He reported past passive suicidal ideations of hanging himself "a long while back," but he denied current suicidal or homicidal ideations, as well as any psychotic processes. (R. at 576-77.) Osborne reported he "went off on teachers if they didn't help [him]." (R. at 577.) He stated he obtained certificates in welding and heavy equipment operation, and he obtained his driver's license via oral means after five or six attempts. (R. at 577.) Osborne stated he quit his job as a welder in 2013 "because of Hep C." (R. at 578.) He denied a history of firings. (R. at 578.) Osborne also denied a history of inpatient psychiatric/psychological treatment. (R. at 577.) He reported a history of Lortab and Percocet abuse from 2006 to 2014. (R. at 577.) Osborne stated he and his estranged wife had a seven-year-old daughter together, with whom he shared custody with his mother. (R. at 578.) He described his relationship with his parents and his girlfriend as "up and down." (R. at 578.)

On mental status examination, Osborne was cooperative, but exhibited low frustration tolerance and agitation during intellectual testing, and he required prompting to attempt responses. (R. at 578.) He had adequate eye contact; spontaneous, relevant and coherent speech; organized and logical stream of thought;

thought content was void of delusions, preoccupations, obsessions or phobias; there was no evidence of hallucinations or delusions; mood was euthymic, but became increasingly agitated over the progression of intellectual testing; affect was broad; he was fully oriented; judgment was impaired; immediate memory was mildly deficient; recent recall was markedly deficient; remote recall was impaired; insight was limited; concentration was adequate; persistence was moderately deficient; pace was moderately slow; and he interacted in a moderately deficient fashion with Fields. (R. at 578-79.)

Although Osborne obtained a full-scale IQ score of 51 on the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), test, Fields deemed these results invalid, as they were inconsistent with his history of adaptive functioning, including certifications in welding and heavy equipment operation, as well as a previous ability to manage finances and high school grades ranging from As to Ds with class ranks of 28/70 and 30/70 in the ninth and tenth grades, respectively. (R. at 579-80.) She also noted these scores did not reflect optimal performance, given Osborne's need for prompting, increasing frustration and deficient persistence. (R. at 580.) Fields diagnosed Osborne with unspecified depressive disorder and opioid use disorder, and she deemed his prognosis as fair with appropriate environmental support and mental health treatment. (R. at 580.) She opined he would benefit from the structure and support of a workplace setting such as sheltered employment due to stress related to gainful employment, and she stated that an exacerbation in mental health symptoms was possible if faced with typical stressors inherent in gainful employment. (R. at 580.)

Osborne received both medical and mental health treatment from Appalachia Family Health during the period relevant to the court's review. He saw Crystal

Burke, L.C.S.W., a licensed clinical social worker, for counseling on March 2, 2017. (R. at 384.) He reported some irritability, but he stated he had not had any "big episodes of 'going off' recently," and he reported mostly staying away from people and things that upset him. (R. at 384.) Osborne stated he did not like to be in public places or around too many people, but he enjoyed activities with his pets. (R. at 384.) On mental status examination, Osborne's appearance/grooming was casual; his mood was mildly depressed with congruent affect; eye contact was appropriate; he arrived to the appointment on time; thought process was intact; he had no paranoia/delusions; judgment and insight were fair; and he had no suicidal or homicidal ideations. (R. at 386.) Burke diagnosed an unspecified mood disorder; intermittent explosive disorder; and opioid dependence, in remission. (R. at 386.) That same day, Osborne saw Dr. Esther S. Ajjarapu, M.D., his primary care provider at Appalachia Family Health. (R. at 412.) He requested his Prozac be increased, but did not complain of back pain, and no physical examination findings were recorded. (R. at 412-15.) Nonetheless, Dr. Ajjarapu diagnosed low back pain, prescribed gabapentin and increased Osborne's Prozac. (R. at 414-15.)

On March 9, 2017, Burke completed a work-related mental assessment, finding Osborne had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to maintain attention/concentration; to understand, remember and carry out both simple and detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 504-06.) She opined he had a serious limitation, resulting in unsatisfactory work performance, in his ability to deal with work stresses; to function independently; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 504-05.) Burke also opined Osborne would be

absent more than two workdays monthly and that he could benefit from psychological testing. (R. at 506.) She provided no support for her opinions. (R. at 504-06.)

On March 30, 2017, Osborne advised Dr. Ajjarapu he was "[t]here to get [a] physical assessment done for [his] lawyer." (R. at 416.) He stated he had been unable to keep jobs due to his back pain, but he did not complain of any back pain at that time, and Dr. Ajjarapu did not record any objective examination findings on this date. (R. at 416-19.) Nonetheless, she diagnosed Osborne with low back pain and prescribed gabapentin. (R. at 418.) Osborne also reported depression and anxiety, but denied any current depressive symptoms. (R. at 416, 418.) Dr. Ajjarapu diagnosed an unspecified mood disorder, she advised him to continue therapy, and she indicated the need for possible screening for a learning disability. (R. at 418.) She prescribed Prozac. (R. at 418.) That same day, Dr. Ajjarapu completed a work-related physical assessment, opining Osborne could lift/carry up to 50 pounds occasionally and up to 20 pounds frequently; stand/walk a total of two hours in an eight-hour workday and for one hour without interruption; sit a total of five hours in an eight-hour workday and for two to three hours without interruption; frequently balance; occasionally climb, kneel and crouch; never stoop or crawl; his ability to push/pull and to speak were affected by his impairment(s); and he was restricted from working around heights, moving machinery, chemicals, dust, noise and fumes. (R. at 453-55.) Dr. Ajjarapu further opined Osborne would be absent from work about one day monthly. (R. at 455.) She stated her opinions were based on Osborne's "reported symptoms." (R. at 453-55.)

Osborne continued to receive mental health and medical treatment with Appalachia Family Health through October 11, 2018. Over this time, he reported

only intermittent psychiatric medication compliance. When Osborne was taking his mental health medications, he described his mood and depression as "mostly stable" and "much better," and he reported not having as many "blow ups." (R. at 392, 403, 440.) Conversely, when he was off his medications, Osborne reported problems with mood regulation and impulse control, stating he had busted out windows, put holes in walls and wanted to hurt himself. (R. at 397.) On July 20, 2017, Osborne reported that counseling was helping. (R. at 420.) Osborne also reported various stressors over this time, including having some family members living with him, relationship stressors, finances and his grandfather's death. (R. at 388, 397.) By July 2018, he reported reduced stress, and he noted he had not had any recent outbursts. (R. at 403, 440.) Although Osborne reported in October 2018 that he had stopped taking his anti-depressant more than a week previously due to headaches, he also stated he had not been feeling depressed. (R. at 460.) He further reported he had not had any outbursts for a couple of months, and he reported overall good activities and no specific mood problems. (R. at 460.)

Osborne's mental status examination findings over this time largely were normal, with only some mildly abnormal findings, including moods that varied from euthymic to mildly anxious to mixed; poor grooming/appearance on two occasions; scattered thought process on two occasions; and fair insight and judgment. (R. at 390-91, 395, 401, 406.) Otherwise, his appearance/judgment was casual; he was fully oriented; eye contact was adequate; thought process was intact; he had no paranoia/delusions; and he had no suicidal/homicidal ideations. (R. at 390-91, 395, 401, 406.) Burke added a diagnosis of unspecified personality disorder in July 2017, and Lisa Muncy, N.P., added a diagnosis of major depressive disorder, recurrent, mild in October 2018. (R. at 390, 467.)

Regarding Osborne's physical complaints over this time, in July and October 2017, he reported low back pain, which radiated into the right leg, as well as neck pain. (R. at 420, 425.) Nonetheless, in July 2017, he stated he had been walking a lot. (R. at 420.) In October 2017, Osborne rated his back pain as a nine on a 10-point scale. (R. at 425.) By March 2018, Osborne's primary complaint was foot pain from kicking a door the previous month. (R. at 432.) He reported he was cutting some wood for people on occasion. (R. at 397.) By July 2018, Osborne reported doing a lot better than his previous visit in March, he denied issues with back or neck pain on that day, and he reported he felt the problem was controlled with his current treatment since his prior visit. (R. at 440.) Finally, in October 2018, Osborne complained only of poison ivy after "working on [his] mother's property – clearing it off." (R. at 464.)

Physical examinations over this time revealed completely normal findings, including a normal gait; normal muscle tone, bulk and strength; normal lumbar lordosis; no tenderness to palpation of the lumbar spine; and normal lumbar range of motion. (R. at 422, 428, 436, 443, 467.) Osborne's diagnoses included low back pain, cervicalgia and unspecified viral hepatitis C without hepatic coma. (R. at 423, 428, 436, 443.) He was prescribed Arthrotec and gabapentin. (R. at 423, 428.)

On August 2, 2018, Burke completed another mental assessment of Osborne, finding he had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out both simple and detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 456-58.) She found Osborne had a serious limitation, resulting in unsatisfactory work performance, in his ability to deal with

work stresses; to understand, remember and carry out complex job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 456-57.) Burke opined Osborne would be absent from work more than two days monthly. (R. at 458.) She did not specify the medical/clinical findings that supported her assessment. (R. at 457-58.)

On October 15, 2018, Jo McClain, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial determination of Osborne's claims. (R. at 107-08.) She found Osborne was moderately[5] limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 107-08.) McClain opined Osborne suffered from severe depressive, bipolar and related disorders, as well as severe personality and impulse-control disorders. (R. at 107.) McClain also completed a mental residual functional capacity assessment of Osborne, finding he was markedly[6] limited in his ability to carry out detailed instructions and to interact appropriately with the general public. (R. at 111-13.) She opined he was moderately limited in his ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek

---

[5] A moderate limitation is defined as functioning that is fair independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020).

[6] A marked limitation is defined as functioning that is seriously limited independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d) (2020).

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting. (R. at 111-12.) In all other areas, McClain opined Osborne was not significantly limited. (R. at 111-12.) She opined Osborne could understand and remember short and simple instructions and procedures; sustain an ordinary routine without special supervision; perform simple work for two-hour blocks to complete a normal workday/workweek; ask simple questions or request assistance; engage in brief, superficial interactions with co-workers and supervisors, but not work with the public; and adjust to occasional changes in the work setting. (R. at 111-12.) In sum, McClain stated Osborne was capable of work that required little or no judgment, involved simple duties in standardized situations with minimal variations, and which generally required dealing with things rather than people. (R. at 113.)

Also on October 15, 2018, Dr. R. S. Kadian, M.D., a state agency physician, completed a physical residual functional capacity assessment of Osborne, finding he could perform medium[7] work with an unlimited ability to climb ramps and stairs and to balance; a frequent ability to climb ladders, ropes and scaffolds, to stoop, to kneel and to crouch; and an occasional ability to crawl. (R. at 109-10.) He opined these postural limitations were supported by Osborne's history of neck and low back pain, as well as his history of hepatitis C. (R. at 110.) Dr. Kadian further opined Osborne

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

had no manipulative, visual, communicative or environmental limitations. (R. at 110.)

On reconsideration of Osborne's claims, Nicole Sampson, Ph.D., a state agency psychologist, completed another PRTF on January 8, 2019, which mirrored that of McClain. (R. at 140-41.) She also agreed with McClain's opinion that Osborne could perform simple, unskilled work. (R. at 141.) Sampson completed a mental residual functional capacity assessment, which was substantially the same as that of McClain, except Sampson did not find Osborne was markedly limited in any area of functioning. (R. at 144-46.) Again, Sampson concluded Osborne could perform simple, routine work. (R. at 146.)

Also on January 8, 2019, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical residual functional capacity assessment in connection with the reconsideration of Osborne's claims, which was substantially the same as that of Dr. Kadian. (R. at 143-44.) The only difference was that Dr. Hutcheson opined Osborne could frequently, instead of occasionally, crawl. (R. at 144.) Dr. Hutcheson imposed no manipulative, visual, communicative or environmental limitations. (R. at 144.) He stated his limitations were based on Osborne's history of neck and low back pain with normal imaging and benign physical exams, as well as his history of treatment for naïve hepatitis C with no resulting complications. (R. at 143-44.)

On February 5, 2019, Osborne returned to Burke, advising he was in a "state of shock" after cutting a tree near a highway the prior weekend when the tree fell into the roadway, striking a car and resulting in the death of a woman. (R. at 518.) He said it was a "terrible accident," but he was arrested and charged with involuntary manslaughter, among other things. (R. at 518.) According to Osborne, the incident

had been "all over the news and social media," and he could not "go anywhere without someone talking about it." (R. at 518.) Burke diagnosed an acute stress reaction, for which they discussed coping strategies. (R. at 518, 521.) Osborne was alert, oriented and cooperative, with fair hygiene and grooming; he had clear and logical thoughts; no psychotic processes; he appeared mildly anxious; and he denied thoughts of harm to self or others. (R. at 518.)

On February 22, 2019, Osborne presented to Wellmont Medical Associates Urgent Care with complaints of nasal congestion, facial pain, cough and headache. (R. at 539-41.) At that time, he denied back pain. (R. at 540.) On examination, Osborne was fully oriented; he had a normal musculoskeletal range of motion; and he had a normal mood, affect and behavior. (R. at 540-41.)

On April 30, 2019, Osborne presented to the emergency department at Mountain View with complaints of right foot pain at the base of the great toe, which began after weed eating two days previously. (R. at 529.) He voiced no other complaints at that time. (R. at 530.) X-rays revealed findings concerning for a nondisplaced fracture through the base of the first digit distal phalanx; however, it was noted this could be artifactual, and clinical correlation for point tenderness was recommended. (R. at 532.) On examination, Osborne was fully oriented and in no acute distress; the plantar aspect of the ball of the right foot was thick with a large callus, and the area was tender with palpation, but no redness, warmth or fluctuance was noted; a possible, small plantar wart was noted; there was no pain to palpation of the right great toe, and there was no swelling or redness; and he had a normal mood, affect, behavior, judgment and thought content. (R. at 530-31.) Dr. Gregory A. Gerlock, M.D., found that the area noted on x-ray to be a possible fracture did

not correspond to any symptoms or pain to palpation. (R. at 532.) Thus, he diagnosed right foot pain and prescribed Norco. (R. at 532.)

On May 12, 2019, Osborne returned to the emergency department at Mountain View with complaints of pain and bruising behind the right knee after moving heavy equipment two to three days previously. (R. at 522.) On examination, Osborne had normal musculoskeletal range of motion; ecchymosis behind the knee, which was tender to palpation associated with some varicosities; some tenderness over the deep venous network over the calf; and swelling and pitting edema compared to the other leg; but he was alert and fully oriented. (R. at 523-24.) X-rays of the right knee were normal, and an ultrasound of the right leg showed no deep vein thrombosis. (R. at 524, 526-28.) Osborne was diagnosed with a knee sprain. (R. at 525.) He returned to the Urgent Care with sinusitis-type complaints on June 19, 2019, at which time he, again, denied back pain. (R. at 535-38.) On examination, Osborne was fully oriented; he had a normal musculoskeletal range of motion; and he had a normal mood, affect and behavior. (R. at 537.)

Osborne returned to Burke for counseling on September 10, 2019, reporting he had been mowing yards and trying to stay busy with small tasks to try to make ends meet financially. (R. at 542.) He stated he had stopped taking Depakote for about two months because his wife told him it made him "grouchy," but he continued to take Prozac. (R. at 542.) Despite reporting several stressors related to the tree cutting incident and his upcoming trial, as well as financial stressors, Osborne stated he was doing "okay" and trying not to worry. (R. at 542.) He was alert, oriented and cooperative; he was in no acute distress; his thoughts were free of psychotic processes; but he appeared mildly anxious. (R. at 542.) Burke diagnosed other specified persistent mood disorders; intermittent explosive disorder; opioid

dependence, in remission; unspecified personality disorder; and unspecified adjustment disorder. (R. at 544.) Osborne also saw Muncy on this date, reporting stiffness and soreness and that he could hardly walk upon awakening, but which he did not pay much attention to once he got moving. (R. at 550.) According to Osborne, he had been "out working a lot in the yard – mowing and planting flowers and weed eating." (R. at 550.) He denied any other issues that day. (R. at 550.) Osborne stated he had not been taking Depakote because he could not afford it, but Prozac was helping his depression and anxiety. (R. at 550.) He reported occasional diarrhea; chronic back pain; knee pain; and mild, but stable, anxiety and depression. (R. at 552.) On examination, he was alert and in no acute distress; he had a normal gait; appropriate judgment; good insight; proper orientation; and a euthymic mood and appropriate affect. (R. at 552-53.) Muncy's diagnoses of Osborne remained unchanged, and she continued him on medication. (R. at 553-54.)

On November 25, 2019, Osborne presented to the emergency department at Norton Community after falling down a hill while walking through the woods, hitting his head and briefly losing consciousness. (R. at 571, 573.) Findings on examination were normal, aside from an abrasion to the right scalp. (R. at 574.) In particular, Osborne had normal musculoskeletal strength; intact range of motion; no edema; a normal gait; no focal weakness; no sensory loss; and a normal psychiatric examination. (R. at 574.) A CT of Osborne's head showed a potential, acute, nondisplaced fracture within the lower lateral aspect of the right maxillary sinus with a large amount of blood products and fluid present. (R. at 565-66.) A CT of Osborne's cervical spine showed an acute, nondisplaced fracture of the right C7 transverse process; an acute, nondisplaced fracture of the anterior and posterior walls of the right maxillary sinus; and mild degenerative disc disease at the C4-C5 and C5-C6 levels. (R. at 567-68.)

On March 24, 2020, Osborne saw Arthur W. Stair, III, M.A., a licensed senior psychological examiner, for a psychological evaluation at his counsel's referral. (R. at 583-90.) Osborne reported anger, an inability to get along with others and thoughts that life was not worth living. (R. at 584.) He said he had been angry and depressed since he graduated from high school, and he reported being fired from multiple jobs because he could not get along with others. (R. at 584-85.) Osborne stated he avoided most others, including close family members, but he said he had a good relationship with his parents. (R. at 584.) He stated he was divorced with a 12-year-old son who was cognitively and physically disabled. (R. at 584.) Osborne stated he lived with his girlfriend. (R. at 584.)

Osborne was not currently taking any prescription medication due to a lack of insurance, but Valium and Klonopin previously had reduced his anxiety. (R. at 584.) Although he briefly took an anti-depressant, Osborne stated it made him more irritable and angry. (R. at 584.) He reported graduating from high school with a special education diploma, and he said he continued to have limitations in reading and math. (R. at 585.) Osborne estimated his anxiety and depression to be at least moderate. (R. at 586-87.) He reported frequent, current suicidal ideation, but no intent, as well as hypomania symptoms, primarily manifested as intense anger outbursts. (R. at 587.)

Osborne had good hygiene and grooming; balance, gait and posture were normal; he was cooperative and fully oriented; he had a below average ability to think abstractly; he easily answered simple, logic-based problems and simple, elementary addition and subtraction problems, but he struggled with relatively simple multiplication and division; he performed somewhat poorly on Serial 7s due to notable anxiety; short-term memory was intact; thinking pattern was somewhat

scattered; he had difficulty maintaining a logical and coherent train of thought; and he demonstrated a below average degree of higher executive functioning. (R. at 585-86.) Stair estimated Osborne's intellectual abilities were in the upper end of the borderline intellectual functioning range, substantiated by his history of special education classes. (R. at 586.) Osborne's affect was mostly appropriate throughout the interview, aside from being overtly anxious; there were no unusual or bizarre behaviors, mannerisms, hallucinations or delusional beliefs; rapport was established; attention span was fair to poor; he was responsive to questioning; speech was normal and understandable; and eye contact was good. (R. at 586.)

The Miller Forensic Assessment of Symptoms Test, ("M-FAST"), did not indicate potential malingered psychopathology, and the Personality Assessment Inventory, ("PAI"), did not indicate symptom exaggeration or malingering. (R. at 588.) The PAI further indicated a person who was at least moderately depressed, anxious and agitated about their circumstances. (R. at 588.) Stair administered two subtests of the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), indicating Osborne's word reading ability was below the fourth-grade level, and his mathematical ability corresponded to the fourth-grade level. (R. at 589.) Stair diagnosed Osborne with bipolar II disorder, moderate; generalized anxiety disorder, moderate, with mild panic features; and borderline intellectual functioning, by estimate, school record review and achievement test results. (R. at 589.) He opined Osborne's ability to understand simple information or directions with the capacity to put it to full use in a vocational setting was at least mildly impaired; his ability to adapt to changes in the workplace was at least moderately impaired; his social relationships were moderately to markedly impaired; and his ability to comprehend and implement multi-step, complex instructions and to maintain persistence and

concentration on tasks for a full workday and workweek were markedly impaired. (R. at 589.)

On April 6, 2020, Stair completed a work-related mental assessment, finding Osborne had a satisfactory ability to follow work rules; to use judgment in public; to understand, remember and carry out simple job instructions; and to maintain personal appearance; and a serious limitation, resulting in unsatisfactory work performance, in his ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention/concentration; to understand, remember and carry out both detailed and complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 591-93.) Stair opined Osborne would be absent from work more than two days monthly. (R. at 593.) He based his findings on Osborne's limitations due to borderline intellectual functioning and additional limitations in focus and concentration due to bipolar II disorder and generalized anxiety disorder. (R. at 592-93.)

On April 26, 2020, at the ALJ's request, Marshall D. Tessnear, Ph.D., a licensed psychologist, rendered an opinion regarding Osborne's mental impairments. (R. at 595-604.) He completed a work-related mental assessment, finding Osborne was not limited in his ability to understand, remember and carry out simple instructions; mildly[8] limited in his ability to make judgments on simple work-related decisions; moderately[9] limited in his ability to interact appropriately with

---

[8] A mild limitation is defined on this assessment as "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." (R. at 602.)

[9] A moderate limitation is defined on this assessment as "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is fair." (R. at 602.)

supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting; and markedly[10] limited in his ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to interact appropriately with the public. (R. at 602-04.) Tessnear opined Osborne's concentration, persistence or pace, as well as his ability to adapt, also were affected by his impairments. (R. at 603.) Specifically, in a narrative report, he opined these abilities were moderately limited, as were Osborne's abilities to understand, remember or apply information and to interact with others. (R. at 596.) Tessnear further opined the evidence did not establish the presence of the "C" criteria. (R. at 600.) That being the case, Tessnear opined that Osborne's impairments did not meet or equal the medical listings found at 20 C.F.R. §§ 12.04, 12.06 or 12.08. (R. at 596, 599.)

In his narrative report, Tessnear noted Osborne's depression appeared to be variable, depending on his circumstances, and he had, at times, reported no depressive symptoms. (R. at 595.) He further noted that Osborne had been in counseling and taken prescribed medications "on and off" and that many of his symptoms abated when he took medication as prescribed. (R. at 595.) Tessnear found Osborne's diagnosis of bipolar II disorder was not supported by the evidence, as the diagnosing examiner reported the symptoms of hypomania primarily were intense anger outbursts, while true hypomanic episodes, according to Tessnear, were characterized by distinct periods of abnormally and persistently elevated, expansive or irritable mood and persistently increased activity or energy lasting at least four consecutive days and present most of the day, every day. (R. at 595.) Tessnear noted Osborne's full-scale IQ score of 51 was deemed invalid due to his poor persistence,

---

[10] A marked limitation is defined on this assessment as "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." (R. at 602.)

as well as his occupational training, work history and general level of adaptive functioning, which suggested he probably was functioning in the borderline range. (R. at 595.) Thus, he opined Osborne likely was functioning in the borderline range of intelligence, and he would be able to perform at least simple, repetitive tasks, but he would have more difficulty with highly detailed or complex tasks. (R. at 596.) He opined that, although Osborne's moods and impulse control improved when taking medications as prescribed, he still would be unable to work with the general public or around large groups. (R. at 596.) Tessnear further opined Osborne should be able to function satisfactorily with only occasional interactions with co-workers or supervisors; he would not perform well on fast-paced tasks or those requiring strictly timed production quotas; he would be able to adapt to some, but not frequent, changes in work routine; and he would be able to regulate his emotions and behavior if compliant with counseling and prescribed medication. (R. at 596.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Osborne argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Osborne contends the ALJ erred by rejecting the opinions of Dr. Ajjarapu, Fields, Burke and Stair, instead relying on the opinions of the state agency reviewers and Tessnear in arriving at his residual functional capacity finding. (Plaintiff's Brief at 6-7.) Osborne also argues the ALJ erred by failing to find his impairments met or equaled 20 C.F.R. §§ 12.04(A)(1) and/or 12.05(B). (Plaintiff's Brief at 7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign

an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[11]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or

---

[11] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2020).

prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[12] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly

---

[12] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2020). Here, the ALJ found Osborne could perform simple, routine, light work with no more than frequent reaching, handling and fingering, bilaterally; no climbing or crawling; no exposure to work hazards; no interaction with the public; and no more than brief and superficial interaction with others in the work environment, defined as no more than five minutes per encounter. (R. at 25.)

In making this residual functional capacity finding, the ALJ found the prior ALJ decision, dated October 25, 2017, was persuasive. (R. at 30.) In this prior decision, the ALJ concluded Osborne could perform work at the medium level of exertion. (R. at 90.) In the current decision, the ALJ correctly noted that, while it was possible Osborne's impairments were subject to change over time, the prior decision was issued only a short time before Osborne's alleged onset date in the current applications, and evidence not considered in the prior decision did not show a significant change in his health and functional ability. (R. at 30.) However, due to Osborne's continued, intermittent complaints of back and neck pain, as well as his testimony regarding hand swelling, the ALJ restricted Osborne to light work with frequent, but not constant, reaching, handling and fingering, bilaterally, and no climbing or crawling, as well as no exposure to work hazards. (R. at 30.)

The ALJ found the March 2017 opinion of Dr. Ajjarapu not persuasive. (R. at 32.) First, the court notes this opinion was rendered approximately nine months prior to Osborne's alleged onset date. Thus, it is not relevant to the time period currently before the court. Moreover, the ALJ correctly stated that the opinion is not supported by Dr. Ajjarapu's entirely normal examination findings, including normal gait; normal muscle tone, bulk and strength; normal lumbar lordosis; no tenderness to palpation of the lumbar spine; normal lumbar range of motion; and stable lumbar spine. (R. at 32, 422, 428.) In addition to Dr. Ajjarapu's physical examinations, the examinations of the other medical providers contained in the record also yielded normal findings. For instance, in March, July and October 2018, nurse practitioner Muncy recorded a normal gait. (R. at 436, 443, 467.) When Osborne presented to the urgent care and/or emergency department in February, May and June 2019, he exhibited a normal musculoskeletal range of motion. (R. at 523, 537.) In November 2019, when Osborne presented to the emergency department after falling down a hill, he had a normal gait, normal musculoskeletal strength and range of motion, no edema, no focal weakness and no sensory loss. (R. at 574.) A CT of the cervical spine at that time revealed a nondisplaced fracture of the right C7 transverse process; mild degenerative disc disease at the C4-C5 and C5-C6 levels; and a nondisplaced right maxillary sinus fracture. (R. at 567-68.)

Moreover, the ALJ correctly noted that Dr. Ajjarapu supported her opinions with "patient's reported symptoms," despite noting that Osborne's x-rays were normal and that he had not undergone an MRI. (R. at 32.)  It is well-settled that a claimant's subjective allegations of pain or other symptoms, alone, can never establish disability. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (2020); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (a physician's recording of a claimant's subjective complaints does not transform the complaints into clinical evidence).

Further, as the ALJ noted, Dr. Ajjarapu conceded there was no objective evidence to support Osborne's subjective allegations. Additionally, the ALJ found Dr. Ajjarapu's opinion was inconsistent with the overall record, including Osborne's reported activities of daily living and work. (R. at 32.) For instance, in July 2017, he stated he was walking a lot, (R. at 420); in October 2018, he reported "working on mother's property – clearing it off," (R. at 464); in October 2018, he also reported he cut firewood to sell for extra money, and he reported overall good activities, (R. at 460); in February 2019, he reported cutting a tree for firewood, (R. at 518); in April 2019, he reported weed eating two days previously, (R. at 529); in May 2019, he reported moving heavy equipment two to three days previously, (R. at 522); in September 2019, he reported stiffness and soreness after he had been "out working a lot in the yard – mowing and planting flowers and weed eating," (R. at 542, 550); in November 2019, he reported falling down a hill while walking through the woods, (R. at 571, 573); and he testified that, in February 2020, he injured his right hand while cutting a tree branch out of a fallen tree with a chainsaw. (R. at 61.) Lastly, the ALJ correctly noted that Osborne consistently performed self-employment work after his alleged onset date, with his reported earnings being largely consistent with his self-employment income prior to his alleged onset date in 2014, 2015, 2016 and 2017. (R. at 29.)

The ALJ found the assessments of state agency physicians, Drs. Kadian and Hutcheson, persuasive. (R. at 32.) Dr. Kadian found Osborne could perform medium work with an unlimited ability to climb ramps and stairs and to balance; frequently climb ladders, ropes and scaffolds, to stoop, to kneel and to crouch; and occasionally crawl. (R. at 110.) Dr. Hutcheson substantially agreed with Dr. Kadian's findings, but he opined Osborne could frequently crawl. (R. at 143-44.) In finding these opinions persuasive, the ALJ explained that state agency physicians have a high

level of understanding of the Social Security disability program, and they had the benefit of reviewing all the evidence in the record when they rendered their opinions. (R. at 31.) The ALJ also stated Osborne received routine and conservative treatment, specifically noting that he was prescribed Arthrotec, but he did not undergo physical therapy or see an orthopedist, a neurosurgeon or a pain management provider. (R. at 29, 32.)

For all the above-stated reasons, I find substantial evidence supports the ALJ's consideration of the opinion evidence related to Osborne's physical impairments, as well as his resulting physical residual functional capacity finding.

In arriving at his mental residual functional capacity finding, the ALJ found the opinions of Fields, Burke and Stair were not persuasive, while finding those of Tessnear and the state agency psychologists were persuasive. Fields opined Osborne would likely benefit from the structure and support of a workplace setting such as a sheltered employment; and that, if faced with typical stressors inherent in gainful employment, an exacerbation in his mental health symptoms was possible. (R. at 580.) With regard to Fields's 2015 opinion, the ALJ first noted it was rendered more than two years prior to Osborne's alleged onset date and was addressed in the prior ALJ's decision. (R. at 31.) Thus, the ALJ correctly found it is not relevant to Osborne's current claims. (R. at 31.) Additionally, the ALJ correctly noted that this opinion also is not supported by Fields's own contemporaneous examination findings, which included, among other things, a cooperative attitude, organized and logical thought process, normal thought content and perception, a euthymic mood and broad affect and adequate concentration. (R. at 31, 78-79.) Moreover, Fields, herself, deemed intellectual testing results obtained that day invalid, as they were inconsistent with Osborne's history of adaptive functioning, including receiving

welding and heavy equipment operation certifications, a previous ability to manage finances and high school grades and class ranks. (R. at 79-80.) Fields additionally noted Osborne did not exert optimal effort on testing. (R. at 80.)

The ALJ also found Burke's March 2017 and August 2018 mental assessments were not persuasive, as they were not supported by her own examination findings. (R. at 32.) These two assessments were substantially similar, and Burke opined Osborne was moderately to markedly limited in making all occupational, performance and personal/social adjustments, and he would be absent more than two workdays monthly. (R. at 456-58, 504-06.) The record reveals Burke's examinations of Osborne were normal, except for some variable mood – from euthymic to mildly anxious to mildly depressed – and an occasionally scattered thought process. (R. at 386, 390-91, 395, 401, 406, 518, 542.) However, Osborne's other findings on mental status examination regularly were intact. (R. at 32, 386, 390-91, 395, 401, 406, 518, 542.) Next, the ALJ correctly noted Burke's opinions were inconsistent with the overall record, which showed normal psychiatric examinations from his primary care providers, including full orientation, euthymic mood, appropriate affect, appropriate judgment, good insight and intact recent and remote memory. (R. at 32, 422-23, 428, 436, 443, 552-53.) Moreover, as the ALJ noted, Osborne saw his counselor only once every few months, and he had only intermittent treatment with Prozac and Depakote, which he reported improved his symptoms. (R. at 32, 392, 397, 403, 428, 440, 542, 550.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Lastly, the ALJ correctly stated Osborne did not require emergent mental health treatment or inpatient psychiatric hospitalization. (R. at 32.)

The ALJ also found Stair's March 2020 opinion not persuasive, as it was not supported by his own examination findings, and it was somewhat inconsistent between the narrative report and the mental assessment. (R. at 33.)  Stair opined Osborne's ability to understand simple information or directions with the capacity to put it to full use in a vocational setting was at least mildly impaired; his ability to adapt to changes in the workplace was at least moderately impaired; his social relationships were moderately to markedly impaired; and his ability to comprehend and implement multi-step, complex instructions and to maintain persistence and concentration on tasks for a full workday and workweek were markedly impaired. (R. at 589.) In a mental assessment, dated approximately two weeks later, Stair opined Osborne was moderately to markedly limited in making all occupational, performance and personal/social adjustments and that he would be absent more than two workdays monthly. (R. at 591-93.) To support his opinions, Stair simply listed his diagnoses of Osborne. (R. at 592-93.) The ALJ noted Stair's finding in the report that Osborne's ability to understand simple information or directions and put it to full use in a vocational setting was "at least mildly impaired," while in the assessment, he found Osborne was moderately limited in this regard. (R. at 33.) The ALJ also correctly stated that such a finding was inconsistent with Osborne's work activity, which showed nearly substantial gainful activity income levels from self-employment. (R. at 33.) Moreover, although Stair noted Osborne was appropriately dressed and groomed, he opined he had a moderately limited ability to maintain personal appearance. (R. at 33.) Additionally, the ALJ stated Stair's opinion was inconsistent with the overall record, which, as noted herein, showed largely normal mental status examination findings, and his only treatment consisted of counseling every few months and intermittent medication management from his primary care providers. (R. at 33.) Lastly, the ALJ stated Stair's opinion was inconsistent with Osborne's own reports of activities to treating providers. (R. at 33.) For instance, he

reported watching television and playing video games, helping care for his autistic daughter, caring for dogs and organizing jobs and driving his girlfriend to job sites. (R. at 20-22.)

In his decision, the ALJ stated he found the opinion of Tessnear, who opined Osborne could perform at least simple, repetitive tasks, could have difficulty with highly detailed or complex tasks, would be unable to work with the general public or around large groups, could have occasional interaction with co-workers and supervisors, would not perform well in fast-paced tasks or with strictly timed production quotas and could adapt to some, but not frequent, changes in work routine, persuasive. (R. at 33-34.) Specifically, the ALJ stated Tessnear's opinion was extensively supported with citations to relevant evidence regarding Osborne's treatment and objective examination findings, and it was consistent with the overall record. (R. at 34.) For instance, as stated herein, Osborne's treatment consisted of counseling every few months and intermittent mental health medication management by his primary care providers. (R. at 34.) Aside from a variable mood, Osborne occasionally exhibited scattered thought process, but other mental status findings throughout the review period generally were intact. (R. at 34.) The ALJ additionally noted a majority of Osborne's complaints and symptoms related to irritability and difficulty getting along with others, which, the ALJ noted was accounted for in the residual functional capacity finding, and that Osborne's limitations in concentration, adaptation and managing himself were accounted for by the restriction to simple, routine tasks with an off-task rate up to 10 percent and an absence rate of one day monthly. (R. at 34.)

The ALJ found the opinions of the state agency psychologists, McClain and Sampson, were persuasive, with Sampson's being more persuasive. (R. at 31-32.)

Both McClain and Sampson opined Osborne was moderately limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 107, 140.) On mental residual functional capacity assessments, Sampson opined he was either moderately limited or not significantly limited in all areas assessed, while McClain opined he had some marked limitations. (R. at 111-13, 144-46.) Both McClain and Sampson opined Osborne could perform simple work. (R. at 129, 146.) In addition to noting that state agency reviewers have a high level of understanding of the Social Security disability program and that McClain and Sampson had the benefit of reviewing all available evidence in the record when they rendered their opinions, the ALJ reiterated that Osborne saw a counselor only every few months with findings of a variable mood and affect, but with other mental status findings regularly being intact. (R. at 31-32.) Thus, the ALJ specifically found Sampson's opinion more persuasive because the record did not support marked limitations in any area. (R. at 32.)

For all these reasons, I find substantial evidence supports the ALJ's consideration of the opinion evidence related to Osborne's mental impairments, as well as his resulting mental residual functional capacity assessment.

Lastly, Osborne argues the ALJ erred by failing to find his impairments met or equaled the medical listings found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(A)(1) and/or 12.05(B). (Plaintiff's Brief at 7.) However, I find substantial evidence supports the ALJ's decision in this regard. The court first notes that Osborne bases his argument on the opinions of Fields, Stair and Burke, all of which the ALJ deemed not persuasive – findings this court now has found to be supported by substantial evidence. Additionally, I find that Osborne is unable to meet the

criteria of these listings for the following reasons. It is well-settled that, in order for a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Under § 12.04, the listing for depressive, bipolar and related disorders, either (A) and (B) or (A) and (C) must be met. Therefore, I first note that Osborne's argument that his impairments meet or equal § 12.04(A)(1), only, is misplaced. Under § 12.04(A), the requirements of paragraph (1) or (2) must be met. Because Osborne argues his impairment(s) meets/equals paragraph (1), only it is set out here:

1. Depressive disorder, characterized by *five* or more of the following:
    a. Depressed mood;
    b. Diminished interest in almost all activities;
    c. Appetite disturbance with change in weight;
    d. Sleep disturbance;
    e. Observable psychomotor agitation or retardation;
    f. Decreased energy;
    g. Feelings of guilt or worthlessness;
    h. Difficulty concentrating or thinking; or
    i. Thoughts of death or suicide.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(1) (2020). Even assuming Osborne can meet the requirements of (A)(1), he still must meet the requirements of either (B) or (C). § 12.04(B) states as follows:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning …:
1. Understand, remember, or apply information. …
2. Interact with others. …
3. Concentrate, persist, or maintain pace. …
4. Adapt or manage oneself. …

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B) (2020). As noted herein, both state agency psychologists opined Osborne was moderately limited in all these areas,

opinions the ALJ found persuasive because they were supported by and consistent with the record. That being said, Osborne's impairments must meet the criteria in (C) before they can be found to meet or equal this listed impairment. Under § 12.04(C), Osborne's mental impairments must be "serious and persistent," meaning he must have a medically documented history of the existence of the disorder for at least two years, and there must be evidence of both of the following:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder...; *and*
2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. ...

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C) (2020). Based on the evidence in the record, and cited herein, I find that Osborne's impairments do not meet or equal these criteria. As the ALJ stated in his decision, Osborne was able to manage his symptoms with conservative treatment, his symptoms improved with medication, and he, at times, did not require use of medication to control his metal health symptoms. (R. at 390-91, 395, 397, 401, 406, 428, 436 443, 510, 516, 537, 541, 553.) As the Commissioner notes in her brief, such a finding also is supported by Tessnear's opinion, as well as the state agency psychologists' findings that Osborne's impairments did not satisfy a listed impairment. (R. at 107-13, 127-29, 144-46, 162-64, 596, 599.)

As for § 12.05(B), the listing for intellectual disorders, a claimant must show all of the following:

1. Significantly subaverage general intellectual functioning evidenced by a or b:
   a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general

intelligence; or

    b.  A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.  Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    a.  Understand, remember, or apply information. …; or
    b.  Interact with others …; or
    c.  Concentrate, persist, or maintain pace …; or
    d.  Adapt or manage oneself …; and

3.  The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B) (2020). As stated above, substantial evidence supports the ALJ's consideration of the opinion evidence, including his finding that the state agency psychologists' opinions that Osborne's abilities to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself were moderately limited. Thus, he cannot meet paragraph (2) of § 12.05(B). Therefore, I find that substantial evidence supports the ALJ's finding that Osborne's impairments did not meet or equal the requirements of this listed impairment.

## PROPOSED FINDINGS OF FACT

    As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the

ALJ's consideration of the opinion evidence;

2.      Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.      Substantial evidence exists in the record to support the Commissioner's finding that Osborne was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Osborne's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      February 11, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE